UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

ESTATE OF KASSIUS EMMANUEL
MAJOR LOFTON, DECEASED
by its personal representative,
Kaizhay Major Lofton,

                    Plaintiff,

v

BOARD OF HOSPITAL MANAGERS FOR THE
CITY OF FLINT, doing business as HURLEY
MEDICAL CENTER, MIKAYLA
REAH, KELLI FOX, DENELLE HENRY,
RACHELLE MOORE, CHRISTA COBURN,
TIARA WELLONS, and DEON JOHNSON,
jointly and severally,

                    Defendants.

CASE NO.
JUDGE:
MAGISTRATE:

DEMAND FOR JURY TRIAL

BEHM & BEHM
By: Michael J. Behm (P48435)
Attorney for Plaintiff
209 Schwartz Drive
Flint, Michigan  48503
(810) 234-2400 / (810) 239-5252(fax)
behmlaw@ameritech.net
behmandbehm@ameritech.net

THE KEANE LAW FIRM, P.C.
By: Christopher J. Keane (P46920)
Co-counsel for Plaintiff
548 Market Street #23851
San Francisco, CA 94104
(415) 742-5412/ (415) 520-2282
eservice@keanelaw.com

1

COMPLAINT AND DEMAND FOR JURY TRIAL

_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

**NOW COMES** the above named Plaintiff, KAIZHAY MAJOR LOFTON, as Personal Representative of the Estate of KASSIUS EMMANUEL MAJOR LOFTON, DECEASED, by and through his attorneys, BEHM & BEHM, by Michael J. Behm, and THE KEANE LAW FIRM, P.C., by Christopher J. Keane, and for his Complaint respectfully states unto this Honorable Court as follows:

### PARTIES, JURISDICTION & VENUE

1.  Plaintiff, ESTATE OF KASSIUS EMMANUEL MAJOR LOFTON, DECEASED, by its personal representative, is a probate estate established and being administered in the Genesee County Probate Court, and assigned case number 2024-24227290-DE on October 15, 2024.  The decedent, KASSIUS EMMANUEL MAJOR LOFTON, then a (2) year old disabled child with Down Syndrome, resided at all times pertinent to this action, in the City of Flint, County of Genesee, State of Michigan, and died in the City of Flint, County of Genesee, State of Michigan.  This wrongful death action is brought by Plaintiff, ESTATE OF KASSIUS EMMANUEL MAJOR LOFTON, DECEASED, by authority of its duly appointed personal representative, Kaizhay Major Lofton, pursuant to MCL 600.2922.

2

COMPLAINT AND DEMAND FOR JURY TRIAL

2. The claim arose, and the events and occurrences which give rise to this claim and action, took place in the City of Flint, County of Genesee, State of Michigan.

3. Venue is further appropriate in the Eastern District of Michigan pursuant to 28 U.S.C. §1391(b) as the case is not based upon diversity of citizenship, and the Board of Hospital Managers for the City of Flint ("HURLEY") are located in the Eastern District of Michigan, and one or more of the individual Defendants who are employees, servants and/or agents of the Board of Hospital Managers for the City of Flint, the State of Michigan's Department of Social Services worked and/or resided in Flint, Michigan, and Defendants, Tiara Wellons ("WELLONS") and Deon Johnson ("JOHNSON") resided in the City of Flint, County of Genesee, State of Michigan, at all times pertinent to this action, and the events that give rise to this lawsuit, including the abuse and death of KASSIUS EMMANUEL MAJOR LOFTON, took place in the City of Flint, County of Genesee, State of Michigan.

4. This is a combination of a civil rights action in which the Plaintiff seeks relief for the violation of rights secured by 42 U.S.C. §1983, the Fourth Amendment to the United States Constitution, the Fourteenth Amendment to the United States Constitution, and state law claims for failure of mandated reporters to report child abuse, and child abuse, all of which combined to proximately cause the wrongful death of an innocent two (2) year old disabled child with Down Syndrome, KASSIUS EMMANUEL MAJOR LOFTON.

COMPLAINT AND DEMAND FOR JURY TRIAL

5.    Primary jurisdiction of this Court is found upon 28 U.S.C.§1331, as the underlying claim is based upon 42 U.S.C. §1983.

6.    Supplemental pendent jurisdiction of this Court as to the state law claims is based upon 28 U.S.C.§1367.

7.    The amount of compensatory damages sought in this action exceeds the jurisdictional minimum of $75,000.00, exclusive of costs and interest as provided by law against all Defendants, and each of them, and attorney fees which are recoverable pursuant to 42. U.S.C. §1983 against the Defendants who are named in those counts, including REAH, FOX, HENRY, WALLACE and COBURN.  The damages sought with respect to the neglect and abuse of KASSIUS are for conscious pain and suffering which KASSIUS suffered after the point in time at which Patricia Carradine ("Carradine"), as instructed by MIKAYLA REAH ("REAH"), returned custody and care of KASSIUS to WELLONS on August 19, 2024, and thereafter through the time of his death on August 21, 2024. Plaintiff is not seeking damages in this Complaint for the conscious pain and suffering of KASSIUS due to neglect and abuse which occurred before Carradine, as instructed by REAH, returned custody and care of KASSIUS to WELLONS on August 19, 2024.

COMPLAINT AND DEMAND FOR JURY TRIAL

8. The acts and omissions of Defendants, and each of them, as set forth in this Complaint proximately caused the additional child abuse, conscious pain and suffering, and wrongful death of KASSIUS EMMANUEL MAJOR LOFTON, who suffered a wrongful death on August 21, 2024, and, consequently, the damages attendant to the wrongful death claimed by Plaintiff and permitted by the Michigan Wrongful Death Act, MCL 600.2922, as set forth elsewhere in this Complaint and incorporated herein in full.

9. At all times pertinent to this action, Defendant MIKAYLA REAH ("REAH"), is sued in her individual capacity, and was employed by the State of Michigan Department of Health and Human Services, as a child protective services (CPS) worker and was acting under color of state law and within the course and scope of her employment with the State of Michigan, and was a resident of the State of Michigan who committed the acts set forth herein in Flint, Michigan.

10. At all times pertinent to this action, Defendant KELLI FOX ("FOX"), is sued in her individual capacity, was employed by the State of Michigan Department of Health and Human Services, as a CPS worker and was acting under color of state law and within the course and scope of her employment with the State of Michigan, and was a resident of the State of Michigan who committed the acts set forth herein in Flint, Michigan.

COMPLAINT AND DEMAND FOR JURY TRIAL

11. At all times pertinent to this action, Defendant DENELLE HENRY ("HENRY"), is sued in her individual capacity, and was employed by the State of Michigan Department of Health and Human Services, as a CPS worker and was acting under color of state law and within the course and scope of her employment with the State of Michigan, and was a resident of the State of Michigan who committed the acts set forth herein in Flint, Michigan.

12. At all times pertinent to this action, Defendant RACHELLE MOORE ("MOORE"), is sued in her individual capacity, and was employed by the State of Michigan Department of Health and Human Services, as a CPS worker and was acting under color of state law and within the course and scope of her employment with the State of Michigan, and was a resident of the State of Michigan who committed the acts set forth herein in Flint, Michigan.

13. At all times pertinent to this action, Defendant, BOARD OF HOSPITAL MANAGERS FOR THE CITY OF FLINT, doing business as HURLEY MEDICAL CENTER, ("HURLEY") is and was at all times pertinent hereto, a governmental entity established by the CITY OF FLINT which owned and operated Hurley Medical Center, and which employed and/or was the servant and/or master of, its employee(s), servant(s) and agent(s), real and/or ostensible, including but not limited to Paula Walko, LMSW ("Walko") and Melissa Brooks, M.D. ("Brooks"), who committed the acts set forth herein in Flint, Michigan, and for which HURLEY is vicariously liable pursuant to respondeat superior, agency and/or master/servant doctrine.

COMPLAINT AND DEMAND FOR JURY TRIAL

14. At all times pertinent to this action Walko and Brooks, and perhaps other employees, servants and agents of HURLEY, were mandated reporters of child abuse and neglect pursuant to MCL 722.623, and were required to report in accordance with that statute and MCL 722.633.

15. At all times pertinent to this action, Defendant, TIARA WELLONS, was a resident of the State of Michigan who committed the acts set forth herein in Flint, Michigan.

16. At all times pertinent to this action, Defendant, DEON JOHNSON, was a resident of the State of Michigan who committed the acts set forth herein in Flint, Michigan.

17. At all times pertinent to this action, the acts and omissions alleged as to persons herein, and each of them, occurred within the course and scope of his/her employment, agency and/or servitude by REAH, FOX, HENRY and MOORE, all as CPS workers employed by the State of Michigan within its Department of Health and Human Services, and all of who as CPS workers who created the danger to KASSIUS by, including but not limited to coordinating and instructing Patricia Carradine to return KASSIUS to TIARA WELLONS, the mother of KASSIUS, as set forth in more detail below, and Walko and Brooks as health care providers (social worker and physician, respectively) in the course and scope of their employment, agency and/or servitude with and by the BOARD OF HOSPITAL MANAGERS FOR THE CITY OF FLINT.

## FACTUAL ALLEGATIONS REGARDING
## THE NEGLECT, ABUSE, AND DEATH OF THE CHILD

18. Plaintiff realleges and incorporates by reference paragraphs 1 through 17 above.

COMPLAINT AND DEMAND FOR JURY TRIAL

19. Upon information and belief, on or about July 20, 2024, at or around 8:47 p.m. KASSIUS's aunt, Brenda Gail Wellons-Watson ("Aunt Gail"), informed CPS worker REAH that KASSIUS was being abused.

20. On or about that time, Aunt Gail texted the following words to REAH, and also included photographs which corresponded with the words: "*Two black eyes.…Bruising and belt buckle mark on his face. Only have photo of one side. Both sides were brused (sic).… More photos of bruising on baby's back...Please let me know if the photos came through*"

21. REAH responded to the text, confirming she had received the information that KASSIUS was being abused, by texting the following words to Aunt Gail: "*They did thank you.*" Aunt Gail responded to the reply text from REAH, by texting the following words to REAH: "*No problem.*"

22. On or about July 21, 2024, at 4:51 a.m., Aunt Gail sent an additional text and photo of the abuse of KASSIUS to REAH, texting the following words and including a photograph which corresponded with the words: "*More photos of bruising on baby's back.…Facial lacerations.  Please take this baby before it is too late.*"

8

COMPLAINT AND DEMAND FOR JURY TRIAL





9

COMPLAINT AND DEMAND FOR JURY TRIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



10

COMPLAINT AND DEMAND FOR JURY TRIAL



11

COMPLAINT AND DEMAND FOR JURY TRIAL



23. REAH, and any other CPS worker who saw those photographs, which were texted by Aunt Gail to REAH, of a disabled, non-verbal, two-year old, who had just begun to crawl, was informed by virtue of those photographs that the injuries depicted thereupon were concerning for physical abuse of KASSIUS, because those photographs depicted injuries which were concerning for having been inflicted on him and, further, based on KASSIUS's developmental history of being a non-verbal, disabled, non-cruising two (2) year old, about which all the CPS workers involved in his case, REAH, FOX, HENRY and  MOORE, were duly advised.

12

COMPLAINT AND DEMAND FOR JURY TRIAL

24. After having received the photographs from Aunt Gail, REAH instructed KASSIUS's grandfather to take KASSIUS to HURLEY for an exam in relation to the abusive injuries and bruising seen on the photographs of KASSIUS given to her by Aunt Gail.

25. On July 22, 2024, KASSIUS's grandfather complied with REAH's instruction, and took KASSIUS to HURLEY for an exam.  At the exam, as documented in the medical records, the providers at HURLEY confirmed that KASSIUS was a non-verbal, two (2) year-old with Down Syndrome who does not walk, and has "*just begun to crawl*".  The records do not state that KASSIUS was yet able to "cruise", which is a term when a baby reaches a developmental stage where he stands and walks while holding onto something.

26. As of July 22, 2024, despite KASSIUS just having begun to crawl, and not being able to yet cruise, KASSIUS had multiple factors concerning for physical abuse of a child: namely, the bruising and marks depicted in the aforementioned photographs from Aunt Gail; and, the history provided by a second adult, his grandfather, which informed the health care providers that KASSIUS was returned to him from KASSIUS's mother with two (2) black eyes, abrasions and marks on his back; and, further, the bruising to the left upper and lower eyelid, and old marks on his back, were present on KASSIUS and confirmed by one of the HURLEY healthcare providers, Brooks.

27. On July 22, 2024, at or around 2:13 – 2:22 p.m., Brooks made a note in KASSIUS's medical record at HURLEY about her encounter with KASSIUS.

COMPLAINT AND DEMAND FOR JURY TRIAL

28. On or around July 22, 2024 at 3:03 p.m., due to the severity of the case and concerns by CPS for the safety of KASSIUS, REAH and FOX chose to place KASSIUS with Carradine.

29. On or around July 22, 2024 at 3:27 p.m., Carradine informed REAH that she had seen WELLONS hit KASSIUS in the face and chest, and that Carradine threw WELLONS out of her home because WELLONS could not follow rules and Carradine did not like WELLONS's parenting, including that Carradine knew that WELLONS would "*slap the fuck out of*" KASSIUS for simply "*crying*".  Carradine also informed REAH that JOHNSON had hit WELLONS, and that WELLONS and JOHNSON were toxic with each other.

30. On or around July 22, 2024 at 3:27 p.m., REAH informed Carradine that KASSIUS may have to stay with her for thirty (30) days, and Carradine informed REAH that she would keep KASSIUS as long as REAH needed her to keep him.  Carradine informed REAH that Carradine would cooperate with CPS.

31. On or around July 22, 2024, at 3:54 p.m., REAH instructed KASSIUS's grandfather that CPS wanted KASSIUS placed with Patricia Carradine, and KASSIUS could no longer stay with his grandfather.  Given the actual and perceived authority of CPS, and given Carradine's own history with CPS, Carradine was leveraged and perceived and understood every instruction given to her by CPS staff, including REAH, to be mandatory state action and instruction(s) with which she was required by law to comply.

14

COMPLAINT AND DEMAND FOR JURY TRIAL

32. On or around July 22, 2024, at 3:57 p.m., REAH spoke with Walko, and thereafter claimed, repeatedly, that Walko did **<u>not</u>** tell her that the bruising on KASSIUS was concerning for physical abuse.

33. On July 22, 2024, at around 4:18 p.m., Brooks electronically signed the HURLEY medical record, and stated therein that KASSIUS had bruising to his left eye which **<u>was</u>** "*concerning for physical abuse*."

34. On July 22, 2024, at or around 4:28 p.m., Walko noted in the HURLEY records that she spoke to REAH and communicated  that she shared Dr. Brooks's findings with REAH.

15

COMPLAINT AND DEMAND FOR JURY TRIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

35. Upon information and belief, at no time from July 22, 2024, until KASSIUS's death on August 21, 2024, did Walko or Brooks, or any other person who was any mandated reporter of child abuse and neglect who was an employee, servant and/or agent, real and/or ostensible, employed by and/or at HURLEY, who, like Walko and Brooks, had reasonable cause to suspect child abuse and neglect of KASSIUS, and despite being mandated reporters, ever report pursuant to the statutory mandates and procedures of MCL 722.623 and MCL 722.633, when each of them had reasonable cause to suspect child abuse or neglect of KASSIUS.  Specifically, Walko and Brooks, and perhaps others, were mandated but failed to make an immediate report to centralized intake by telephone, or, if available, through the online reporting system, of the suspected child abuse or child neglect of KASSIUS.  Further, Walko and Brooks, and perhaps others, failed to file a written report as required in this act.  Further, since Walko and Brooks were member(s) of the staff of HURLEY, a hospital, they were mandated to notify the person in charge of the hospital, of their findings, and that the report has been made, and were mandated to make a copy of the written or electronic report available to the person in charge of the hospital.  Further, even if Walko or Brooks notified the person in charge of the hospital, it did not relieve them of the obligation of reporting to the State of Michigan Department of Health and Human Services as required by MCL 722.623 and MCL 722.633.

16

COMPLAINT AND DEMAND FOR JURY TRIAL

36. On or around July 22, 2024, at 5:06 p.m., REAH instructed Patricia Carradine to meet her to pick up KASSIUS from KASSIUS's grandfather.  Carradine informed REAH she would comply with REAH's instruction.

37. On or around July 22, 2024, at 5:39 p.m., as instructed, Carradine met REAH at KASSIUS's grandfather's residence, and Carradine was thereby given physical custody of KASSIUS, pursuant to coordination and instruction of REAH.

38. On or around July 23, 2024, at 9:02 p.m., REAH coordinated and instructed Carradine and WELLONS to appear at the official CPS office with KASSIUS on July 24, 2024, at 1:30 p.m. for an official Team Decision Making (TDM) meeting.

39. On or around July 24, 2024, Carradine and WELLONS complied with that instruction from REAH, and appeared with KASSIUS at the official CPS office.

40. On or around July 24, 2024, at or around 1:05 p.m., REAH obtained KASSIUS's medical record from HURLEY, and claimed that in the HURLEY record she received "it was not noted if the injuries were consistent with abuse or not"; however, while this statement by REAH may have been consistent with what Walko told REAH her by phone, the statement itself was **false**, as the HURLEY record for KASSIUS **did** state that the bruising on KASSIUS's left eye was "***concerning for physical abuse***".

41. On or around July 24, 2024, at or around 1:30 p.m., REAH and FOX coordinated and conducted the TDM at the official CPS office with Carradine, WELLONS and KASSIUS.

COMPLAINT AND DEMAND FOR JURY TRIAL

42. On July 25, 2024, at or around 2:49 p.m., approximately three (3) days after REAH claimed she was <u>not</u> informed by Walko that the bruising on KASSIUS's left eye was "***concerning for physical abuse***", REAH printed and read the medical records for KASSIUS from HURLEY, which included the written words set forth in paragraph twenty-six (26), above, namely, that the bruising to KASSIUS's left eye **<u>was</u>** "***concerning for physical abuse***", and by virtue of which medical record she was informed that the bruising on KASSIUS **<u>was</u>** "***concerning for physical abuse***", but despite that warning, REAH continued to comport herself in a manner that was based upon the incorrect initial misstatement she allegedly received from Walko; namely, that the bruising on KASSIUS was **<u>not</u>** concerning for abuse.

43. In addition to the medical exam by HURLEY staff, REAH and FOX had coordinated another medical exam for KASSIUS at the University of Michigan Medical Center (UMMC), to occur on August 1, 2024. The exam did not occur on that date.

44. On or around August 5, 2024, REAH, FOX and HENRY coordinated the continuation of placement with Carradine, and a 14 day TDM referral was submitted.

45. On or around August 6, 2024, at or around 10:00 a.m., REAH and FOX coordinated and carried out a case conference for KASSIUS.

46. On or around August 6, 2024, at or around 10:42 a.m., REAH coordinated and instructed Carradine to appear for a TDM at 1:00 p.m.

COMPLAINT AND DEMAND FOR JURY TRIAL

47. On or around August 6, 2024, at or around 1:00 p.m., REAH and FOX coordinated and carried out a TDM and determined that KASSIUS would stay in Carradine's custody until a medical exam was conducted at UMMC on August 13, 2024.  The TDM stated that if WELLONS decided to terminate the TVA and return KASSIUS to her home, then *WELLONS and Carradine* "will immediately" notify CPS; **not**, that CPS would take the initiative and notify Carradine before a TVA was terminated, or even that a TVA was expiring, and instruct her to return KASSIUS when Carradine, who was leveraged by CPS, was not otherwise going to, nor was otherwise required to, return KASSIUS to WELLONS, and when Carradine would not have returned KASSIUS to WELLONS because Carradine knew it was dangerous for KASSIUS to be placed with WELLONS, unless and until, and only because, she was instructed by CPS to do so.

48. On or around August 15, 2024, at or around 12:09 p.m., UMMC child abuse pediatric physician, Bethany Mohr, M.D., called REAH and Mohr informed REAH that Mohr has concern for abuse due to injuries on KASSIUS's face "***from the pictures***," which pictures had been previously available to CPS, HURLEY, and FLINT, and specifically including but not limited to REAH, FOX, and HENRY, as early as July 20, 2024, and Meeks, as early as July 31, 2024.  Mohr reported to REAH that when Mohr spoke to WELLONS, presumably on August 13, 2024, at the time of the UMMC visit, that WELLONS did not know how KASSIUS got the bruises.  Mohr reported to REAH that the injury was inconsistent with the stories provided.

19

COMPLAINT AND DEMAND FOR JURY TRIAL

49. On or around August 15, 2024, at or around 1:00 p.m., REAH and FOX had a case conference concerning KASSIUS, at which time REAH informed FOX that Mohr had informed her that that the injuries on KASSIUS's face as depicted in the photographs which were provided to CPS on July 20, 2024, were concerning for abuse.

50. On August 16, 2024 at or around 1:00 p.m., REAH and FOX had a supervision case conference concerning KASSIUS wherein it was determined that the case was being opened for physical abuse due to WELLONS's story not being consistent with the marks on the child's face, and that KASSIUS's case was "*being monitored*" by CPS and services from CPS were "*ongoing*".

COMPLAINT AND DEMAND FOR JURY TRIAL

51. On August 16, 2024, at or around 1:54 p.m., despite the fact that pursuant to DHSS Regulations, including but perhaps not limited to PSM 713-01, discussions concerning a TVA were to be <u>led</u> by the parent, and that any decision to change, extend or stop the arrangement rested with the parent, not with CPS, it was CPS, through REAH, who led the discussion and contacted WELLONS and Carradine, and REAH instructed CARRADINE to return KASSIUS to WELLONS on August 19, 2024, when Carradine was not otherwise going to return KASSIUS to WELLONS, was prepared to keep him as long as needed, was informed that may be up to 30 days from July 22, 2024, which 30 day period would have run from July 22, 2024 through the end of the day (11:59 p.m.) on August 21, 2024, and Carradine would not have returned KASSIUS to WELLONS unless and until instructed to do so by CPS, and REAH, and despite the further fact that REAH, along with FOX, knew WELLONS to have anger management issues, and to have been neglectful and/or abusive, or both, to KASSIUS, with respect to causing or allowing the injuries to him, including bruising on his face that was depicted in the photographs that were provided to CPS, including but not limited to REAH, on July 20, 2024, REAH nonetheless created a danger for KASSIUS which did not otherwise exist by instructing the leveraged Carradine to return KASSIUS to WELLONS on August 19, 2024.

COMPLAINT AND DEMAND FOR JURY TRIAL

52. The danger of KASSIUS being neglected and/or abused again by WELLONS did not exist for KASSIUS unless and until REAH instructed Carradine on August 16, 2024, to return KASSIUS to WELLONS on August 19, 2024.   That is because absent that state action by REAH, Carradine would have kept custody and control KASSIUS, because she had been keeping him safe from WELLONS and intended to keep him safe from WELLONS.  Because of that state action by REAH, however, REAH created a danger for KASSIUS which otherwise did not exist, by instructing Carradine to place KASSIUS in danger, with WELLONS.

53. On or before August 19, 2024, MOORE, a CPS worker, coordinated and signed the DHS 154 Disposition, confirming that CPS knew WELLONS was a safety danger to KASSIUS, and that KASSIUS was no longer safe remaining with WELLONS, acknowledging that there was a preponderance of evidence that WELLONS had physically abused KASSIUS as depicted on the July 20, 2024 photographs.

54. Between the time on August 19, 2024 that KASSIUS was returned to the residence of WELLONS, at the instruction of REAH, and the time of his death on August 21, 2024, WELLONS and JOHNSON, who was an acquaintance of WELLONS, neglected, and repeatedly abused, assaulted, and/or battered KASSIUS.

22

COMPLAINT AND DEMAND FOR JURY TRIAL

55. On or around August 21, 2024, at or around 5:13 p.m., COBURN, a CPS worker, went to see KASSIUS, because CPS, through its staff including COBURN, REAH, FOX, and HENRY, all of whom had a special relationship with KASSIUS, knew that they had caused KASSIUS to be placed in danger when Carradine had been instructed to return KASSIUS to WELLONS on August 19, 2024.

56. REAH and FOX, at a minimum, and perhaps others including HENRY, knew the disposition of KASSIUS as a ward of CPS who was a confirmed and known vulnerable, disabled, neglected and abused child, had been effectuated as of August 19, 2024, by WALLACE, yet still left KASSIUS alone in the pit of danger which they, and each of them, had created by instructing Carradine on August 16, 2024 to return KASSIUS to the WELLONS on August 19, 2024.

57. On or around August 21, 2024, at or around 5:13 p.m., COBURN, a CPS worker, came to WELLONS residence, saw JOHNSON there, and also saw KASSIUS, still alive, but with then visible abusive markings and bruises on his body, including purple, black and blue markings on both sides of his face, and purple, black and blue markings to his mid-chest level.  These abusive markings, which COBURN saw, are accurately depicted in photographs taken later that day:

COMPLAINT AND DEMAND FOR JURY TRIAL





COMPLAINT AND DEMAND FOR JURY TRIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21   58.  Despite seeing KASSIUS with these abusive markings, and in a residence with people

22        who REAH, FOX, HENRY, and COBURN knew were dangerous to KASSIUS,

23        COBURN left KASSIUS there and was deliberately indifferent to the serious medical

24        needs he had on that date and at that time which would have, more likely than not,

25        relieved his conscious pain and suffering, and prevented his wrongful death.

26

27        25

28

COMPLAINT AND DEMAND FOR JURY TRIAL

59. On or around August 21, 2024, at or around 9:11 p.m., phone call was received by FLINT that KASSIUS was in full arrest.

60. On or around August 21, 2024, at or around 9:22 p.m., after a few cycles of CPR, KASSIUS was pronounced dead.   This death, and the abusive beating that preceded the death, occurred within the thirty (30) day period that Carradine was prepared for and indicated she would maintain custody and control of KASSIUS, and for which period of time Carradine would have maintained custody and control of KASSIUS, but for REAH instructing Carradine on August 16, 2024 to return KASSIUS to WELLONS on August 19, 2024, wherein and whereupon REAH, FOX, HENRY, and COBURN created and maintained a danger to KASSIUS, and/or were deliberately indifferent to his serious medical needs, which danger otherwise did not and would not have existed because Carradine was not going to give physical custody of KASSIUS to WELLONS unless and until CPS staff, such as but perhaps not limited to, REAH, instructed her to do.

61. On or around August 31, 2024, which was after KASSIUS was killed, FOX signed her approval of the previous disposition of KASSIUS as a ward of CPS, which disposition had been effectuated on August 19, 2024, while KASSIUS was still alive, thereby ratifying WALLACE's state action of effectuating disposition of KASSIUS as a confirmed and known vulnerable, disabled, neglected and abused child on August 19, 2024.

COMPLAINT AND DEMAND FOR JURY TRIAL

62. Prior to his wrongful death on August 21, 2024, KASSIUS endured horrific conscious pain and suffering which was proximately caused by the acts and omissions of the Defendants, individually and vicariously by their employees, servants (actual and/or borrowed) and agents (real and/or ostensible), and each of them, as set forth in this Complaint.

63. As a result of the wrongful death of KASSIUS, certain of his relations who are legally eligible and/or not excluded from claiming damages for the loss of society and companionship of KASSIUS pursuant to MCL 600.2922, suffered the loss of society and companionship of KASSIUS.

64. The acts and omissions of the Defendants, individually and by and through their employees, servants (borrowed or actual) and agents (real and/or ostensible), and each of them, was the legal and proximate cause of KASSIUS enduring conscious pain and suffering before his death, and his wrongful death.

### COUNT I

**(42 U.S.C. §1983 – STATE CREATED DANGER**
**AS TO DEFENDANTS, REAH, FOX, HENRY, WALLACE & COBURN)**

65. Plaintiff realleges and incorporates by reference paragraphs 1 through 64 above.

COMPLAINT AND DEMAND FOR JURY TRIAL

66. The Due Process Clause of the Fourteenth (14th) Amendment prohibits any state actor from depriving any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  Governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed, and it protects those interests enumerated in the Constitution, certain interests so rooted in the traditions and conscience of our people as to be fundamental, and freedom from government actions that shock the conscience.

67. Deprivation of life and liberty in violation of the substantive due process guarantees of the Fourteenth (14th) Amendment is actionable pursuant to 42 U.S.C. §1983.

68. In this action, as set forth in this Complaint, the affirmative act(s) of REAH, FOX, HENRY, WALLACE, and COBURN, created or increased the risk of danger to KASSIUS.

28

COMPLAINT AND DEMAND FOR JURY TRIAL

69. More specifically, this includes but may not be limited to, that state actors created or increased the risk of danger to KASSIUS specifically by, but not limited to, that REAH, FOX, HENRY, and WALLACE, authorized, instructed and led the discussion and coordination with Carradine on August 16, 2024, to return custody of KASSIUS to WELLONS on August 19, 2024.  Carradine was not required to and/or would not have returned KASSIUS to WELLONS's custody on August 19, 2024, or at anytime but for, unless and until instructed to do so by CPS, including but not limited to REAH, FOX, HENRY, and WALLACE.  First, Carradine was leveraged by CPS to do exactly what CPS instructed her to do, due to her own previous history and involvement with CPS, meaning that Carradine felt compelled to comply with CPS instructions so that Carradine would not lose custody of her own children.  Second, Carradine knew that WELLONS was neglecting and abusing KASSIUS, including but not limited to that WELLONS would "*smack*" him in the face just because the baby was crying, and Carradine would not have returned KASSIUS to WELLONS, or JOHNSON, of her own act or volition, because she knew it was dangerous for KASSIUS to be left with WELLONS, or JOHNSON.  Third, Carradine intended to, would have, and was prepared to keep KASSIUS safe and in her custody as long as was needed, including but not limited to that she was expressly informed by CPS and had already agreed to keep him through at least 30 days, which would have been through the date of August 21, 2024, the date he was killed, yet CPS instructed Carradine on August 16, 2024, to return KASSIUS to WELLONS on  August 19, 2024.

COMPLAINT AND DEMAND FOR JURY TRIAL

70. More specifically, this includes but may not be limited to, there was no legal requirement for CPS staff to call, text or otherwise instruct Carradine to return KASSIUS to WELLONS's custody on August 19, 2024.  The act of CPS staff to plan, coordinate, and then instruct Carradine to return KASSIUS to WELLONS was not only an unnecessary affirmative act by a state actor since the arrangement which was made by WELLONS to leave custody of her child with Carradine was a voluntary arrangement between WELLONS and Carradine that did not require CPS to call, text or otherwise instruct the private parties to the arrangement what, if anything, needed to be done to or at the termination of a previous voluntary agreement, but it was an express act which was stupid, reckless, deliberately indifferent to KASSIUS's vulnerability and safety in that it caused Carradine to return KASSIUS's physical custody to WELLONS when she otherwise was not required to do so, and would not have done so because she knew it was unsafe for KASSIUS to do so, and only would have done so and only did so because CPS staff, including REAH, instructed her to do so.  If CPS and REAH had not instructed Carradine to return physical custody of KASSIUS to WELLONS on August 19, 2024, Carradine would have kept and maintained KASSIUS safely in her custody indefinitely, including but not limited to through the time of his death on August 21, 2024, and KASSIUS would not have been further neglected, abused and killed between August 19, 2024 and August 21, 2024 while under the custody of WELLONS, with JOHNSON, because he would have remained with Carradine.

71. In this action, as set forth in this Complaint, the affirmative act(s) of REAH, FOX, HENRY, WALLACE, and COBURN, created or increased the risk of a special danger to KASSIUS, as distinguished from the public at large.

COMPLAINT AND DEMAND FOR JURY TRIAL

72. More specifically, this includes but may not be limited to, that there was a risk or a special danger to KASSIUS when he was in the custody of WELLONS, because, including but not limited to: (a) neglect and/or abuse of a child is a directed and/or an intentional act by specific person(s) in relation to a specific child, usually by the person(s) in custody and control of a specific, known child, as opposed to a random child by a random stranger who is unrelated to the child, by birth or other arranged relation (*i.e.* boy scout leader, priest, etc.), and (b) a child with the characteristics of KASSIUS, meaning including but not limited to, non-verbal, young [*i.e.* two (2) years old], and disabled with Down Syndrome, is at an increased risk of being neglected and abused by the adult(s) who have physical custody and control of the specific child, than a child who is verbal, older, and healthy, and (c) a specific, known child who has been neglected and abused in the past when in the custody of a specific, known adult is at an increased risk of additional neglect or abuse when in the custody and control of the same adult(s) in the future, and (d) a specific, known child who has been neglected and abused in the past when in the custody of a specific, known adult is at an increased risk of not only additional neglect or abuse when in the custody and control of the specific, known adult(s) in the future, but also escalating frequency, intensity, and severity of abuse, including catastrophic injury and death.

COMPLAINT AND DEMAND FOR JURY TRIAL

73. More specifically, this includes but may not be limited to, that there was a risk or a special danger to KASSIUS when she was in the custody of WELLONS, which was known to CPS, including but not limited to REAH, FOX, HENRY, WALLACE, and COBURN, because, including but not limited to: (a) KASSIUS was the child of WELLONS, and JOHNSON was an acquaintance of WELLONS, and (b) KASSIUS was non-verbal, young [*i.e.* two (2) years old], and disabled with Down Syndrome, and (c) prior to August 16, 2024, KASSIUS had been neglected and abused when in the custody of a WELLONS, and (d) prior to August 16, 2024, KASSIUS had suffered multiple abusive injuries when in the custody of WELLONS, including but not limited to on his face and back.

74. In this action, as set forth in this Complaint, the affirmative act(s) of REAH, FOX, HENRY, WALLACE, and COBURN, were so egregious, and so outrageous, that it may fairly be said to shock the contemporary conscience.

COMPLAINT AND DEMAND FOR JURY TRIAL

75. More specifically, this includes but may not be limited to, as set forth in this Complaint, CPS staff, including but perhaps not limited to REAH, FOX, HENRY, WALLACE, and COBURN, and each of them, knew or had reason to know of a specific risk of danger to KASSIUS which was posed by having him reside with WELLONS, and JOHNSON, because REAH, FOX, HENRY, WALLACE, and COBURN, knew or had reason to know that WELLONS, whose acquaintance was JOHNSON, had previously neglected and abused KASSIUS, and knew that allowing WELLONS, who was an acquaintance of JOHNSON, to have custody and control of KASSIUS, would foreseeably result in further neglect and abuse, from which it was foreseeable KASSIUS would suffer escalating abuse and neglect, including death, as KASSIUS was a defenseless, vulnerable, disabled, and non-verbal two (2) year-old child with Down Syndrome, and that neglect and abuse of KASSIUS by WELLONS, with JOHNSON, were the likely cause of the abusive injuries shown on the photographs provided to REAH, FOX, HENRY, WALLACE, and COBURN, as early as July 20, 2024, and that the neglectful and abusive nature of the injuries was made known to REAH, FOX, HENRY, WALLACE, and COBURN, by multiple means prior to the neglect of and abuse which was inflicted on KASSIUS between the time he was returned to WELLONS's custody on August 19, 2024 and the time of his death on August 21, 2024.

COMPLAINT AND DEMAND FOR JURY TRIAL

76. And more specifically, this includes but may not be limited to, as set forth in this Complaint, that CPS staff, including but perhaps not limited to REAH, FOX, HENRY, WALLACE, and COBURN, and each of them, as set forth above and incorporated herein in full, engaged in one and/or more of the following affirmative acts which created or increased danger to KASSIUS, including (a) coordinating, supervising, communicating with, and instructing Carradine on August 16, 2024, to return KASSIUS to WELLONS on August 19, 2024, when such acts were unnecessary, not required by law, and were likely to increase or create the danger to KASSIUS because such coordination, supervision, and instruction to Carradine was likely to, and did, cause Carradine to return custody and control of KASSIUS to WELLONS on August 19, 2024, when Carradine would not have otherwise returned KASSIUS  to WELLONS because Carradine knew that KASSIUS was at risk of being further neglected and abused by WELLONS as she knew of neglectful and abusive behavior Carradine had seen WELLONS engage in with KASSIUS prior to August 16, 2024, and was only complying with the stupid, reckless, and dangerous CPS instruction because CPS so instructed, and (b) coordinating, supervising, and affirmatively executing "*disposition*" of KASSIUS by CPS on August 19, 2024, due to the prior history of neglect and abuse of KASSIUS, as evidenced by photos of abusive injuries on his face and back which were provided to CPS by July 21, 2024, and which abusive injuries occurred while KASSIUS was in the custody of WELLONS, and which "*disposition*" was for the purpose of removing KASSIUS from the danger posed by WELLONS, but despite that "*disposition*" on August 19, 2024, CPS

COMPLAINT AND DEMAND FOR JURY TRIAL

staff, nonetheless expressly coordinated, supervised, and expressly instructed Carradine to return KASSIUS directly to the person from whom he needed to be protected, WELLONS, on August 19, 2024, when it was anticipated and planned by CPS that KASSIUS would and could remain safely with a person other than WELLONS, in this case Carradine, through the end of the CPS investigation so that CPS could learn whether, or not, the injuries depicted on KASSIUS were abusive, or not, such that KASSIUS could either be safely returned to WELLONS if the injuries on the photographs were not abusive, but that he would not be returned to WELLONS custody if it was determined that the injuries to KASSIUS were abusive, and as of August 16, 2024, CPS staff knew that WELLONS had neglected, and abused KASSIUS, and despite that, and despite the fact that they took the affirmative act of disposition of KASSIUS as a CPS ward on August 19, 2024, they expressly created and/or increased a danger to KASSIUS by instructing Carradine to return him to WELLONS, and (c) physically inspecting KASSIUS on August 21, 2024, while he was still alive, and well after disposition was effectuated on August 19, 2024, and seeing not only that WELLONS had left him with JOHNSON, but that KASSIUS had new abusive injuries on his body, including purple, black and blue markings on both sides of his face, and purple, black and blue markings to his mid-chest level, and denying him medical care to relieve his pain and suffering, and to prevent his death.

77. The aforementioned acts and omissions proximately caused Plaintiff's damages as set forth in this complaint, and incorporated herein in full.

COMPLAINT AND DEMAND FOR JURY TRIAL

**COUNT II**

**(42 U.S.C. §1983 – DELIBERATE INDIFFERENCE
TO SERIOUS MEDICAL NEEDS AS TO DEFENDANT COBURN)**

78. Plaintiff realleges and incorporates by reference paragraphs 1 through 77 above.

79. CPS had "*dispositioned*" KASSIUS into CPS's care, custody, and/or supervision on August 19, 2024, and away from Carradine, where he had been safe and otherwise cared for, and KASSIUS was, therefore and thereupon, entitled to, at a minimum, protection of the Fourteenth (14th) Amendment by CPS with respect to his medical care for injuries after they had expressly caused him to be placed in a danger which they created and/or increased.

80. The Due Process Clause of the Fourteenth (14th) Amendment prohibits any state actor from depriving any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  Governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed, and it protects those interests enumerated in the Constitution, certain interests so rooted in the traditions and conscience of our people as to be fundamental, and freedom from government actions that shock the conscience.

81. Deprivation of life and liberty in violation of the substantive due process guarantees of the Fourteenth (14th) Amendment is actionable pursuant to 42 U.S.C. §1983.

82. CPS supervisory staff instructed COBURN to physically inspect the health and safety of KASSIUS on August 21, 2024.

COMPLAINT AND DEMAND FOR JURY TRIAL

83. In COBURN's capacity as a state actor who was personally charged by CPS staff with checking on the health and safety of KASSIUS on August 21, 2024, COBURN owed KASSIUS a duty to refrain from violating his civil rights which were guaranteed by the Fourteenth (14th) Amendment to the United States Constitution.

84. At the time that COBURN saw KASSIUS on August 21, 2024, KASSIUS was alive but had serious injuries as depicted in the photographs depicted in paragraph fifty-eight (58) which required medical care, and which were so obvious that even a lay person would easily recognize the need for KASSIUS to have a doctor's attention.

85. At the time that COBURN saw KASSIUS on August 21, 2024, COBURN knew that KASSIUS had serious injuries which required medical care and/or acted with deliberate indifference in checking KASSIUS's health.

86. Despite her knowledge of and/or deliberate indifference towards KASSIUS's health and serious injuries which required medical care when COBURN saw KASSIUS on August 21, 2024, COBURN denied KASSIUS medical care on August 21, 2024.

87. COBURN acted with deliberate indifference to the serious medical needs of KASSIUS on August 21, 2024.

88. COBURN made a deliberate decision not to act to prevent progression of the injuries to KASSIUS's health on August 21, 2024.

89. The aforementioned acts and omissions proximately caused Plaintiff's damages as set forth in this complaint, and incorporated herein in full.

COMPLAINT AND DEMAND FOR JURY TRIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT III**

**(42 U.S.C. §1983 – FAILURE TO INTERVENE
AS TO DEFENDANTS REAH, FOX, HENRY, WALLACE AND COBURN)**

90. Plaintiff realleges and incorporates by reference paragraphs 1 through 89 above.

91. The Due Process Clause of the Fourteenth (14th) Amendment prohibits any state actor from depriving any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  Governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed, and it protects those interests enumerated in the Constitution, certain interests so rooted in the traditions and conscience of our people as to be fundamental, and freedom from government actions that shock the conscience.

92. Deprivation of life and liberty in violation of the substantive due process guarantees of the Fourteenth (14th) Amendment is actionable pursuant to 42 U.S.C. §1983.

93. During the constitutional violations alleged above, the Defendants, REAH, FOX, HENRY, WALLACE, and COBURN, and each of them, and perhaps others unknown to Plaintiff, observed or had reason to know that such violations were occurring, and did not intervene to try to stop such violations despite having a reasonable opportunity to do so and the means of preventing such unlawful conduct.

94. The aforementioned acts and omissions proximately caused Plaintiff's damages as set forth in this complaint, and incorporated herein in full.

**COUNT IV**

**(MCL 722.623 – VIOLATION OF MICHIGAN
CHILD PROTECTION LAW AS TO HURLEY)**

38

COMPLAINT AND DEMAND FOR JURY TRIAL

95. Plaintiff realleges and incorporates by reference paragraphs 1 through 94 above.

96. On July 22, 2024, there was reasonable cause for, including but not limited to, Walko and Brooks, to suspect child abuse or neglect of KASSIUS.

97. On and around July 22, 2024, employees, servants (actual and/or borrowed), and agents (real and/or ostensible) including but not limited to Walko and Brooks, were required pursuant to MCL 722.623 but negligently failed to make immediately, by telephone or otherwise, an oral report, or cause an oral report to be made, of the suspected child abuse or neglect to centralized intake because there was reasonable cause to suspect child abuse of KASSIUS.

98. Additionally, on July 22, 2024, employees, servants (actual and/or borrowed), and agents (real and/or ostensible) including but not limited to Walko and Brooks, were required pursuant to MCL 722.623 but negligently failed to notify the person in charge of the hospital of his or her finding and that the report has been made to centralized intake.

99. Additionally, within 72 hours of having breached the duty to make the oral report on July 22, 2024, employees, servants (actual and/or borrowed), and agents (real and/or ostensible) including but not limited to Walko and Brooks, were required pursuant to MCL 722.623 but negligently failed to issue a written report on the suspected child abuse or neglect of KASSIUS.

COMPLAINT AND DEMAND FOR JURY TRIAL

100.     Pursuant to MCL 722.633, individually and by virtue of vicarious liability and respondeat superior liability for the negligent acts and omissions of its employees, servants (real and/or borrowed), and agents (actual and/or ostensible), with respect to the aforementioned violations and failures to comply with Michigan's Child Protection Law, including but not limited to Walko and Brooks, Defendant, HURLEY, is civilly liable for the damages of Plaintiff proximately caused by those violations and failures of, including but not limited to, Walko and Brooks Michigan's Child Protection Law.

101.     The aforementioned acts and omissions were negligent, and negligent *per se*, and proximately caused Plaintiff's damages as set forth in this complaint, and incorporated herein in full.

### COUNT V

### (CHILD ABUSE & CHILD NEGLECT – AS TO WELLONS AND JOHNSON)

102.     Plaintiff realleges and incorporates by reference paragraphs 1 through 101 above.

103.     Pursuant to MCL 722.622(g), "Child abuse" means harm or threatened harm to a child's health or welfare that occurs through nonaccidental physical or mental injury, or maltreatment, by a parent, a legal guardian, any other person responsible for the child's health or welfare.

104.     Pursuant to MCL 722.622(k), "Child neglect" means harm or threatened harm to a child's health or welfare by a parent, legal guardian, or any other person responsible for the child's health or welfare that occurs through either of the following: (i) Negligent treatment, including the failure to provide adequate medical care, or by the failure to seek

40

COMPLAINT AND DEMAND FOR JURY TRIAL

financial or other reasonable means to provide adequate medical care, and/or (ii) Placing a child at an unreasonable risk to the child's health or welfare by failure of the parent, legal guardian, or other person responsible for the child's health or welfare to intervene to eliminate that risk when that person is able to do so and has, or should have, knowledge of the risk.

105.    From the time that WELLONS received care and custody of KASSIUS on August 19, 2024, from Carradine, as and because Carradine was so instructed by REAH, until the time of death of KASSIUS on August 21, 2024, WELLONS acted and/or omitted actions which constituted "child neglect" and/or "child abuse" of KASSIUS as defined by MCL 722.622(g) and (k), including but not limited to causing and/or allowing to be caused the injuries depicted in the photographs in paragraph fifty-eight (58), and the internal damage to KASSIUS's body related thereto, and failing to obtain medical treatment for those injuries, all of which caused KASSIUS conscious pain and suffering before his death, and wrongful death on August 21, 2024.

106.    From the time that WELLONS received care and custody of KASSIUS on August 19, 2024, from Carradine, as and because Carradine was so instructed by REAH, until the time of death of KASSIUS on August 21, 2024, JOHNSON acted and/or omitted actions which constituted "child neglect" and/or "child abuse" of KASSIUS as defined by MCL 722.622(g) and (k), including but not limited to causing and/or allowing to be caused the injuries depicted in the photographs in paragraph fifty-eight (58), and the internal damage to KASSIUS's body related thereto, and failing to obtain medical treatment for those

COMPLAINT AND DEMAND FOR JURY TRIAL

injuries, all of which caused KASSIUS conscious pain and suffering before his death, and wrongful death on August 21, 2024.

107.     WELLONS's and JOHNSON's "child abuse" and "child neglect" of KASSIUS, as set forth above, is actionable as to them as negligence *per se* for violation of MCL 722.622(g) and (k) and the same acts and/or omissions also constitute willful misconduct, wanton misconduct and gross negligence.

108.     The aforementioned acts and omissions  proximately caused Plaintiff's damages as set forth in this complaint, and incorporated herein in full.


## **RELIEF REQUESTED**

WHEREFORE, Plaintiff, ESTATE OF KASSIUS EMMANUEL MAJOR LOFTON, DECEASED, by its personal representative, respectfully requests this Honorable Court enter judgment in Plaintiff's favor and against Defendants, BOARD OF HOSPITAL MANAGERS FOR THE CITY OF FLINT, doing business as HURLEY MEDICAL CENTER, MIKAYLA REAH, KELLI FOX, DENELLE HENRY,  RACHELLE MOORE, CHRISTA COBURN, TIARA WELLONS, and DEON JOHNSON, and each of them, and jointly and severally where applicable by law with respect to 42 U.S.C. §1983 defendants, for:


a.     Full and fair compensatory damages in an amount to be determined by a jury, in excess of the jurisdictional minimum, and

COMPLAINT AND DEMAND FOR JURY TRIAL

b.    Interest, and costs of this action, as permitted by statute, and attorney fees incurred in the

42 U.S.C. §1983 action, including but limited to the Equal Access to Justice Act, 28 U.S.C. §

2412, 42 U.S.C. § 1988, and F.R.C.P. 54, and

c.    Any other relief that is fair and just.

**PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully Submitted,

Dated: August 28, 2025        By: s/ Michael J. Behm
                              BEHM & BEHM
                              209 Schwartz Drive
                              Flint, MI 48503
                              (810) 234-2400
                              behmandbehm@ameritech.net
                              P48435

Dated: August 28, 2025        By: s/ Christopher J. Keane
                              THE KEANE LAW FIRM, P.C.
                              548 Market Street #23851
                              San Francisco, CA 94104
                              (415) 742-5412
                              eservice@keanelaw.com
                              P46920

COMPLAINT AND DEMAND FOR JURY TRIAL